IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 MAR 22  PM 2: 37

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| BRITTANY BENEFIELD, a minor, | ) | |
| suing by and through her mother, | ) | |
| JACQUELINE BENEFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV: |
| | ) | |
| THE BOARD OF TRUSTEES | ) | CV-02-J-0734-S |
| OF THE UNIVERSITY OF | ) | |
| ALABAMA at BIRMINGHAM, | ) | |
| a public corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## Complaint

1.        This is an action for damages and equitable relief to redress violations of

the First and Fourteenth Amendments to the Constitution of the United States.

This action is brought to secure the protection and redress the deprivation of

rights secured by Title IX of the Education Amendments of 1972, 20 U.S.C.

§1681, et seq.

2.        Federal subject matter jurisdiction exists pursuant to Title IX of the

Education Amendments of 1972, 20 U.S.C. §1681, et seq.

### Parties

3.        The Plaintiff is a citizen of the State of Alabama who brings this action

on behalf of her daughter, a minor.

4.        The Defendant, The Board of Trustees of the University of Alabama at

Birmingham (hereinafter "UAB" or "the University"), is a public corporation
existing pursuant to and by virtue of the Constitution and Laws of the State of
Alabama.  It is the entity charged with the duty, inter alia, of operating an
institution of higher education in Birmingham, Alabama.  UAB is an educational
institution subject to the provisions of Title IX.

5.      At all times material herein, the Plaintiff was a member of a protected class and
a student in an educational program or activity receiving federal financial
assistance pursuant to 20 U.S.C. §1681, et seq. ("Title IX").

### Historical Facts

6.      By accepting Federal financial assistance pursuant to 20 U.S.C. §1681,
et seq., the Defendant UAB has waived all forms of immunity, including
Eleventh Amendment immunity, to actions brought under Title IX.

7.      At all times material herein, the Plaintiff was a member of a protective
class and a student in an educational program or activity receiving federal
financial assistance pursuant to 20 U.S.C. §1681, et seq. ("Title IX"); a "fund
recipient" under Title IX.

### Facts at Bar

8.      At all material times Benefield (hereinafter referred to as "Benefield") was
a minor, fourteen and fifteen years of age.

9.      Benefield entered UAB after being contacted and recruited by members
of the UAB administration, following published news reports of her remarkable
academic achievements.  She received financial aid through UAB in the form of

-2-

an academic scholarship.

10.        Prior to accepting the offer by UAB, Benefield and her parents met with various administrators, police officers and employees of UAB concerning matters of her age, physical and emotional needs, and her bodily protection.

### Facts at Bar

11.        At the University's request, Benefield  and her parent met with *Virginia D. Gauld*, Ph.D., the University's Vice President of Student Affairs, to discuss the school and the University's desire to have her attend.  They were also taken to meet with *W. Ann Reynolds*, Ph.D., University President.  They were given a personal tour of the campus.   Each was impressed with Benefield and expressed their desire that she would attend UAB.  Each was made aware of her parent's concerns about her personal safety and well being.  Each of these individuals gave assurances of the same.

12.        UAB officials were eager for Benefield to attend school in the winter quarter, while she was still fourteen years old.   Benefield and her parents declined to do so.  An agreement was reached for her to begin college during the Spring quarter.

13.        Even starting in the Spring, Benefield was the youngest student at UAB, and perhaps the youngest ever to attend that University.  As expected, Benefield's parents were worried about housing arrangements and security.  It was not practical for Benefield to commute to school as it was many hours from her home.  This is especially so because both her parents had to work and, of

course, she had neither a car nor driver's license.

14.        Prior to accepting UAB's offer to attend school Benefield and her parents wanted assurances that she would be cared for and protected; i.e., care and protection commensurate with her youth.  To that end they met with **Warren F. Hale** ("Hale"), Director of Student Housing and Residential Life, **Susan McKinnon** ("McKinnon"), Assistant Vice President for Enrollment Management and a victim witnesses coordinator with the UAB police department.  It was during these meetings that the family received expressed assurances that Benefield would receive special treatment; that she would be "watched" and that the University would provide for all additional care and protection needed for someone so young.

15.        The family was told of the security measures in her dormitory and that it would be the safest living arrangement.  That is to say, they were told that the dormitories were a safe, protected environment in which Benefield could live.  Further, specific assurances were given concerning the security system in Rast Hall, with  security officers checking the comings and goings of individuals during the night and early morning hours.  Also, assurances were given about protection against rape and sexual crimes.

16.        In recognition of their responsibility to care for this child, **McKinnon** and **Hale** told Benefield  and her parents that one of her suite mates would be a resident assistant. It was explained to them  that this is an "older student paid by the University, exhibiting leadership skills and mature character."  They were

told that this person was required to "monitor the conduct of that portion of the dorm to which they were assigned" and, of course, would monitor Benefield's activities in and about the dormitory and mentor her. At or just prior to her arrival on campus all dormitory personnel were made aware of her tender years. Benefield was also given the UAB Student Housing and Residential Life Information packet (attached hereto and made a part hereof as **EXHIBIT "A"**).

17.     In addition, Benefield's mother specifically told **McKinnon** and **Hale** that should "any problems" arise they should call her and she would come to help Benefield; to which these defendants answered with an unequivocal "yes." Benefield and her parents made certain these individuals knew and understood their particular concern because of Benefield's age and their particular fears of violence to her person.

18.     Without these assurances, neither Benefield nor her parents would have accepted the scholarship offer to attend UAB. Likewise, UAB would have never had the public relations advantage of trumpeting the fact that they had the youngest college student in the state.

19.     Benefield began college within weeks of her fifteenth (15) birthday. During her first week on campus she was introduced to **Sergeant Steven Forsyth**, a UAB police sergeant. He wanted to meet her as he had heard about her and knew she was just a child. Other police officers and police department employees knew Benefield's age. The fact that such a young student was on campus was common knowledge among those employed by the campus police

-5-

department.

20.        Benefield was, as expected, very excited and nervous about being away from home and starting college so young.   She was provided a student identification, indicating among other things her date of birth.   Her housing application also contained vital information about her name, parents address and telephone number, as well as her date of birth.  All UAB records she filled out prior to being assigned her room gave her parents home address and telephone number.  The University required that the lease be signed by Benefield and her mother because of her age and for purposes of financial responsibility.   That information, along with the other information concerning where Benefield's parents lived, i.e., her permanent address, and how to get in contact with them, was permanently on file at UAB, easily obtainable by UAB and its employees.

21.        Benefield did quite well during her first quarter.  Her routine was to attend classes and spend her work and leisure time in her room.  She was shy and had few actual friends at school.  Her first quarter grades were quite good, a 3.5 GPA.

22.        Within months of arriving on campus, Benefield was forced to move and leave the more protected environment of Rast Hall.  Her new dormitory, Blazer Hall, did not provide the protection of an R.A. roommate, despite their ability to do so, contrary to their agreement and with Hale's attitude that they "don't ask the girls about their lifestyle."  She lived in her room alone.  Benefield would no longer have a resident assistant as promised.  This dormitory housed many

University football and basketball players.  Further, the comings and goings of students, in particular student scholarship athletes, went unmonitored by UAB employees or those to whom they charged with the responsibility of Benefield's protection, as represented.

23.        ***Angela Ward*** was her resident assistant in Blazer Hall, but not her roommate. At the beginning of the summer quarter, Angela scheduled a meeting for the dormitory residents.  At this meeting Ward announced to all those present, including many UAB football and basketball players, that "this was the 15 year old" they had heard about.  After that meeting, a number of University football players began initiating conversations with Benefield.

24.        Not long after this pronouncement she was approached by several other football players.  It was as a result of their encouragement that she had her first beer; conveniently provided by them.  University officials knew of the illegal drinking.  They did nothing to stop it.

25.        Her first sexual encounter came during the Summer quarter.  Thereafter the drinking and sexual abuse in campus dormitories with UAB football players increased at a mind spinning rate, with none of the parental oversight promised by the University.  Her need for acceptance and her naivete about the consequences, played right into the hands of these UAB football players who simply used her as their "play thing."  UAB officials knew of their sexual exploitation.  They did nothing to stop it.

26.        The sexual encounters came at their behest, and included both UAB

-7-

football and basketball players.  Benefield essentially became known as the "15 year old that would have sex with athletes."  They were alluring to her.  She felt acceptance within a group of older, experienced males.  Given her tender years, she was impressionable.  Her actions gained her notoriety.  The UAB officials knew, including members of the UAB football coaching staff and campus police!

27.          Despite this knowledge of sexual abuse and exploitation, the UAB officials neither intervened, conducted an investigation, contacted her parents as promised, nor contacted the State Department of Human Resources, child protection unit ("DHR"), turning their collective backs in violation of state law and her Constitutional rights.  Nor, absent said statute, did any UAB official contact any authority with resources to aid an abused child or Benefield's parents who they knew would be concerned about their child's abuse and exploitation, and, to whom they promised such notice.

28.          Word of sexual abuse became known to UAB officials as early as late July, 2000 shortly after her forced move to Blazer Hall.  In August, 2000 Benefield was called in for a meeting with **Hale**, **Rachel Smith**,  Residence Life Coordinator, and **Forsyth**.  It was at this meeting that Benefield was asked about her sexual activities with football and basketball players.  Benefield did not admit to the sexual abuse.  None of these individuals, despite assurances to the contrary to her parents, telephoned Benefield's parents to inform her of these rumors nor, in accordance with mandates of state law, telephoned DHR.

No UAB official investigated or even asked others about these rumors, but simply remained silent.  No UAB official investigated or even inquired among the players about their sexual abuse of the Plaintiff.  They took no action to protect Benefield from the continued sexual abuse and exploitation; but did take action to protect these players.  Protecting the players was more important than protecting Benefield.

29.     Very shortly after this meeting, *Hale*, in an effort to protect the players, had a conversation with a UAB assistant football coach, *Larry Crowe* ("Crowe"). During that meeting Hale informed Crowe of what he knew and the need to protect the players from potential criminal or civil liability.  Hale told Crowe that because of Benefield's age she could not consent to sexual activity.  Shortly after that meeting, the University's head football coach, *Watson Brown*, told his players to "stay away" from Benefield.  Brown knew some of his players had illegal sexual activity with Benefield.  Brown told his players that if it "gets outside of me I can no longer help you" and it could mean "jail time."  Again, however, with knowledge of their actions, UAB officials neither informed authorities,  nor Benefield's parents, nor did anything to protect this child from the ongoing abuse at the hands of the players.  It was not until December 2000 that Hale through an E-mail reported to Gauld of all the many problems on campus concerning the abuse of Benefield (This E-mail is attached hereto and made a part hereof as *EXHIBIT "B"*).  Thereafter, Gauld did nothing, other than to report Benefield's plight to the University President with the words "...

sometimes we win and sometimes we lose!"

30.　　　　Several days later, **Coach Crowe** drove by Rast Hall and in conversation with several players told them to stay out of Benefield's room and identified the specific room in which she lived.

31.　　　　A short time after these "directives", which did nothing to protect Benefield, a UAB police officer boarded a football team bus and told the players they should "be careful" as Benefield was fifteen years old. Predictably, the exploitation continued. These "warnings" only served as a reminder to be "careful" but not to stop. Neither this officer, nor the others, did what was legally required and informed DHR or Benefield's parents. No investigation was initiated. Again UAB officials did nothing. Protecting the football program was foremost in the minds of these officials.

32.　　　　Incredibly, one of the individuals sexually abusing Benefield was none other than an employee of the UAB police department, **Angelo Willis**. He abused and exploited this child. This abuse took place on campus property during this same period when other police officers were warning the players. The conspiracy of silence simply acted as a grant of permission to the players and UAB employees to continue with their exploitation.

33.　　　　The actions of one prominent player on the football team is a typical example of how these adult males abused this child. This player would, from time to time, appear at Benefield's dormitory room with alcohol and ask if she wanted "a drink." He then would tell her that he "never had sex with a 15 year

old" and thereafter he would sexually abuse her. Others would simply show up at her door or come by under the pretext of needing help with homework. During this period of time, she began drinking heavily and started smoking marijuana in her dormitory room, also supplied by UAB players. The problems grew and grew, until all of the degrading and shameful exploitation became a daily affair. The drinking, sexual abuse and drugs were also well known to the resident assistants.

34.     On one occasion, she was asked to come to the dormitory room occupied by two players. It was at this time that they surprised her with two other young men. They proceeded to abuse her multiple times. She went back to her room crying. She kept spiraling out of control.

35.     As her addiction to marijuana grew, she became bolder about it. She started smoking "pot" daily and was never shy about who knew it. The smell emanated from her room and throughout the dormitory. No UAB official said anything to her, DHR or, as promised, her parents; not even her then Resident Assistant.

36.     Benefield began drinking "hard" liquor. This addiction started with brandy and ended with vodka as her "drink of choice." Much of this supplied by UAB players in furtherance of their need to exploit this child. Further, her marijuana use escalated to cocaine, ecstacy and LSD. Remarkably, a University hospital employee began exchanging morphine and other narcotics with Benefield for cocaine.

-11-

37.      In September of the school year, another meeting was held.  This time, despite the evidence of sexual abuse, illegal drugs and alcohol, administration officials **Forsyth, Smith** and **Deborah Morgette**, Assistant Director of Residential Life, met with Benefield to discuss curfew!  She was once again asked about the rumors of her sexual abuse with players.  Benefield "assured" them that it was not true.  Smith also was aware of Benefield's use of marijuana because Smith learned of the use of drugs from a resident assistant.  Again, they failed to notify Benefield's parents of their suspicions nor did they contact DHR for an appropriate investigation.  Again, UAB officials knew the abuse was continuing.  The warnings had been made to the players, but nothing else was done by these adults for this child.  Nothing was done to stop the abuse.  The abuse was allowed to continue at an increasing rate.

38.      Further, UAB officials never took any affirmative action by contacting her roommate/R.A.; asking the players about these rumors or their conduct.  The players were never fined, disciplined, reprimanded, investigated or otherwise deterred from their sexual exploitation.  Football was too important.

39.      Each UAB official, out of fear of exposing the "cash cow" that is college football, chose not to inquire further; not to report and not to telephone Benefield's parents.  This inaction and indifference perpetuated the sexual abuse.  Between July and November 2000, Benefield was sexually abused by dozens of players, students and employees of the University.  The abuse was daily and consisted of countless separate acts of sexual abuse.

-12-

40.      Benefield's grades began to suffer noticeably.  Her abuse increased.  Her "drinking and drugging" continued.  All of this took place under the watchful eye of resident assistants, dormitory guards, UAB police, athletic coaches and university administrators.

41.      Although UAB officials knew that in the case of children an earlier intervention will result in less permanent damage to the child, in each instance they failed to act.  Nothing was done to stop the abuse.

42.      Benefield's Grade Point Average went from a first term of a 3.5 to 1.9 toward the end of her college career.  Benefield had not been to class for months.  No professor or UAB official ever notified her parents.  Clearly, no UAB official was monitoring her academic progress or assimilation to college life.  Worse than that however, she almost died.

43.      On one particular occasion in the Fall, while in her dormitory and with knowledge of the resident assistants, including *LaKeisha Thompson*, she drank multiple shots of "Crown Royal" liquor.  She suffered from alcohol poisoning requiring treatment.  Despite assurances of "preferential treatment and care commensurate with her tender years" her parents were never notified.  A number of University police and hall personnel, including various UAB officials viewed Benefield in various states of inebriation and "high' on drugs.  Some even drank and "smoked pot" with her yet,  again, no one informed her Parents nor other authorities.

44.      Benefield began using her meal and rent money to finance her addictions.

As early as November 7 of the school year, she started receiving eviction notices. None of these "warnings" were sent to her parents, who were financially responsible for Benefield's room and board. None of these warnings were acted upon by any UAB official. Again, nothing was done.

45.     September, 2000, the beginning of the Fall Quarter, was the last time she attended classes. Despite this, she remained at school through mid December, 2000 and not once were her parents notified of her grades, late rent payments, or even the simple matter of her class attendance. Despite all this, not one of these "persons in loco parentis", these UAB officials thought to check on her. Not one adult person checked to determine (a) how her grades were (b) what life was like for her in the dorm (c) was she having any socialization problems, as she was but 15 years old  (d) how was her class attendance or (e) how do the R.A.'s say she is doing.

46.     It was not until mid December that Benefield's mother had any indication that her daughter was having problems.

47.     Benefield's mother had scheduled to pick up Benefield at school on December 15. Christmas was ten days away and as expected, her mother was very excited about having her young daughter home for the holidays. Having never gone to college, she knew nothing of campus life other than what Benefield told her and the assurances of care and communication she received before handing her daughter over to these educators.

48.     She received a return call from a man who identified himself as a UAB

policeman.  This officer then told Benefield's mother that Benefield had been breaking curfew, had not been going to class and that her grade point average was 1.9.  For almost half a year Benefield had been repeatedly sexually abused, addicted to drugs and alcohol, and the first contact to her parents came as a result of a call initiated by Benefield's mom herself!

49.        Notification of a troubled child came not from someone in campus housing; someone dealing with residential life issues; "enrollment management;" her assigned counselor or resident assistant; neither from the University's head of security; nor from any of those persons with whom her parents spoke and who provided the promises of protection and oversight.  It took a campus cop to call, 6 months into the ordeal, to say that their 15 year old daughter was not going to class, had a GPA well below anything they had ever seen; was not paying for her campus housing; and that they found drug paraphernalia in her room!

50.        Immediately following her return home, Benefield's parents took steps to have her enter an adolescent rehabilitation center.  This happened on Christmas Eve.  She remained 22 days, was detoxed and began receiving intensive narcotics and alcohol counseling.  Once removed from the exposure and through her parents intervention she was able to decide that she needed help.  She was simply sick and tired of being sick and tired.  She completed the rehabilitation program and currently attends aftercare meetings.  The meetings will last her entire life.

51.     The University's actions and inaction culminated in the withdrawal of
Benefield from school and an end to her dreams of completing her degree and
beginning her career before reaching nineteen years of age.  Benefield is now
forced to look forward only to alcohol and drug programs; evaluation for the
existence of sexually transmitted diseases and AIDS; and, work to repay debts.
Beginning with Benefield's initial enrollment to the current date the only written
communication from UAB officials and UAB has been the monthly notices
concerning rent arrearages which began soon after her withdrawal from the
University.

52.     Her recovery is expected to take several years;  a recovery that will never
be complete.

53.     UAB officials herein knew of the problems. She was fourteen years old
when UAB recruited her.  She had just turned fifteen years old when she
actually started school.  Despite her tender years, the promises, state law and
Constitutional guarantees, not one adult, prefect, UAB policeman, coach, or
administrator did anything to protect or inform.  Not one adult person connected
with UAB made an attempt to protect her from the obvious problems of young
men and vulnerable girls.  They permitted the sexual abuse and exploitation to
continue until Benefield almost died.  *Gauld* notified *Reynolds* via E-mail of the
saga concerning their child prodigy Benefield.  In this E-mail Gauld, among other
things, told Reynolds that with regard to Benefield, "Just wanted you to be
aware that sometimes we win and sometimes we lose."  Reynold's response

was "Benefield's story is the making of a 'B' movie." (This E-mail is attached hereto and made a part hereof as **EXHIBIT "C"**)  Incredibly, Reynolds did nothing; no reporting, no investigation, no questioning of players, UAB officials or others.  Not even a telephone call to Benefield or her parents to express her concern or find out how the University failed her.

54.        Reporting, in accordance with §26-14-1, et seq., would cause an investigation.  As part of that investigation it is required by state law that the child be interviewed, as well as parents be notified.  Said interview would have demonstrated the abuse, identified some of the perpetrators, caused the parents to remove their child from that environment and prevented continued, abhorrent behavior toward this child.  Had this occurred Benefield would have never been exposed to narcotics and other illicit drugs.  Had this occurred, the abuse would have stopped shortly after it had started.

55.        The players, individually and as scholarship athletes on the football and basketball teams with UAB, all of an age where their actions constituted illegal sexual activity, while on the UAB campus, during the months of July through November, sexual intercourse and other illicit sex with Benefield.  During this time countless players and students sexually abused and exploited Benefield.

56.        Angelo Willis, an employee of the University also committed acts of child abuse and exploitation, while on University property.

57.        No UAB officials informed Benefield's mother as promised of problems that were seen and known to them.  Further, all of the above actions and

-17-

deliberate indifference to sexual harassment was so severe, pervasive, and objectively offensive that it deprived Benefield of access to educational opportunities or benefits provided by UAB.

58.    At all times material herein Benefield was subject to sexual harassment. The sexual harassment consisted of offensive gender based conduct sufficiently severe or pervasive to create an objectively hostile or abusive educational environment.

59.    At all times material herein, UAB knew of the harassment and failed to take steps reasonably calculated to end the abuse. In fact, no steps were taken to end the abuse. UAB was deliberately indifferent to the sexual harassment. UAB knew that players and employee Willis, between July and November 2000, committed countless acts of sexual abuse.

60.    At all times material herein UAB knew that players and employee Willis and an employee of the University Hospital supplied to Benefield illegal drugs and alcohol.

61.    In addition, at all times material herein, the UAB police department was charged with the duty to protect students and enforce the laws. Further, they are charged with carrying out a specific Code of Ethics in furtherance of their duties. (A copy of said Code is attached hereto as **EXHIBIT "D".**) Among other things said Code mandates that the police shall protect the innocent against deception and the weak against oppression and intimidation. UAB police officers are not permitted to allow personal feelings or friendship to influence

their decisions, with no compromise for crime.   They were required to thoroughly, objectively and expeditiously investigate all reports of crime.

62.      Members of this department including, but not limited to *Harry Marzette, Steven Forsyth, Gary Cooper* and *Billy England*,   breached their expressed and implied duty as it relates to Benefield.  No crimes involving sexual assault, illegal drugs or the illegal use of alcohol as it related to Benefield were ever investigated.  The total failure of the police department members to protect Benefield and stop the known sexual abuse substantially contributed to the oppressive and pervasive sexual harassment of Benefield depriving her of educational opportunities and benefits at UAB.

63.      All of the above actions constitute gender-based conduct sufficiently severe or pervasive to create an objectively hostile and abusive educational environment which deprived Benefield of access to educational opportunities or benefits provided by UAB.

64.      Damages are sought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.; e.g Franklin v. Gwinnett County Public Schools, 503 U.S. 60 and Davis v. Monroe County Board of Education, 526 U.S. 629.

65.      The conduct, as aforesaid, was violative of Title IX in that it amounted to discrimination on the basis of sex, for which plaintiff claims compensatory and punitive damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiff seeks injunctive relief and

demands judgment against The Board of Trustees of the University of Alabama at Birmingham, a public corporation, in compensatory damages of $20 million, punitive damages of $20 million, plus interest from the date of judgment, and the cost of this action, including reasonable attorneys' fees.

Respectfully submitted,

John F. Whitaker
State Bar No.: ASB-3054-E61J
Attorney for Plaintiff

Sadler❖Sullivan, P.C.
2500 SouthTrust Tower
420 20th Street, North
Birmingham, AL  35203
(205) 326-4166

Terrence F. Dytrych
Florida Bar No.  310557
Attorney for Plaintiff

Terrence F. Dytrych, P.A.
712 U.S. Highway 1, Suite 301-32
North Palm Beach, FL. 33408
(561) 841-2232

**PLAINTIFF RESPECTFULLY DEMANDS TRIAL BY JURY**

John F. Whitaker



# Student Housing and Residential Life

### Information, Application, and Agreement



Exhibit A

size beds, one dresser or chest, one desk, one night table, one sofa, one end table, one living room chair, and one dining table with four chairs. Lamps are not included.

In each efficiency apartment there is a living room/bedroom combination, one bathroom and a kitchen with a stove and refrigerator. Each is furnished with one twin size bed, one chest, one living room chair, one end table, one desk, and one dining table with four chairs. Lamps are not included.

Located on the ground floor of each hall are coin operated washers and dryers.

## GARDEN APARTMENTS

The Garden Apartments are comprised of two bedroom unfurnished apartments for students with custodial care of children. (Copy of marriage certificate/birth certificate must accompany application for family housing). Due to safety regulations, students with children will not be assigned housing in the residence halls.

In each apartment there are two bedrooms, one bathroom, a living room/dining room combination and a kitchen with a stove and refrigerator. A playground is conveniently located for children.

# ELIGIBILITY REQUIREMENTS FOR STUDENT HOUSING

Access to Student Housing is limited to students who are admitted to UAB and who are in good standing.  "Good Standing" means not on academic or disciplinary suspension. As an additional eligibility requirement, a student must be enrolled for 5 credit hours as an undergraduate and 3 credit hours as a graduate each term. The Summer Term is treated under a separate contract. The student will be required to satisfy these eligibility standards throughout the term of there Student Housing Contract and to inform the Department of Student Housing and Residential Life of any changes in his/her status which may affect his/her eligibility.

**A one-time priority is given only to Scholarship recipients. Scholarship recipients must be verified by the Admissions Office.**

Professional Students, Interns, Residents and Fellows must be verified by the department to be eligible for Student Housing.

## ROOMMATES

Roommate requests must be mutual in order to receive consideration. Applications should be mailed at approximately the same time. Although every effort will be made to place you with the roommate of your choice, we cannot guarantee roommate requests and must reserve the right to assign any applicant to any available space.

## STUDENT HOUSING STAFF

There are staff members residing in Student Housing to assist the residents.  In each hall or area, there is a Residence Life Coordinator whose primary responsibility is to coordinate the hall or area operation. Residing throughout the halls are a number of student staff members (Resident Assistants) responsible for developmental programming, floor administration, resource information, peer mentoring, and the enforcement of Student Housing policies.

## FOOD SERVICE

The Dragon's Lair Café, located in the Hill University Center, invites all residence hall students to visit us for breakfast, lunch and dinner. A variety of meal plan options are available that include 12, 24, 48 or 60 meals. Meal plan tickets may be purchased at the Dragon's Lair Café. Checks should be made payable to 'Dragon's Lair Café'. Meal plan tickets are valid during the term of purchase and are not transferable to the next term.

The Dragon's Lair Café offers a wide variety of ethnic, regional, and seasonal menu choices. Throughout the year, a number of special occasions and holidays will be celebrated with unique menus and decorations. Birthday and special occasion cakes are also available through special orders. Hours for service are Monday through Friday, 7:00 am to 3:00 pm and 4:30 pm to 7:00 pm.

The Dragon's Lair Café is managed in a partnership agreement between the Division of Student Affairs at UAB and the Department of Food and Nutrition Services, UAB Hospital. Registered Dietitians, Certified Chefs, and management staff work in cooperation to create balanced nutritious meals. If you have questions regarding meal plans or special occasion cakes, please contact the Dragon's Lair Café at 934-8045.

## SPECIAL ACCOMMODATIONS

Students with disabilities who may require special accommodations must contact the Director of Student Housing and Residential Life prior to any assignment being made and be registered with UAB Disability Support Services.

# APPLICATION PROCEDURES FOR UAB STUDENT HOUSING

You are encouraged to apply for Student Housing as soon as possible in order to receive housing on campus. Students have the choice of preferencing housing from the options available. Please refer to the costs and pre-requisites for each prior to making preferences. Please note, if your housing preferences are not available, you will be assigned to an available space. Upon receipt of a completed Student Housing and Residential Life Application and Student Housing Agreement, and a $170 deposit/application fee (which is non-refundable), a room will be reserved for you. If you request a specific roommate, this person must also request you as a roommate on his/her application. It is very helpful for these applications to be returned together. Requests will be honored when possible, but are not guaranteed. Otherwise, room assignments are made on a first come, first serve basis.

The residence hall application process begins with a sign-up period in April 1999 for current UAB residence hall students. After the initial sign-up period, new entering students and transfer students applications are processed by the date they are received. New entering and transfer students will receive room and residence hall assignments during the summer months.

If you have any questions, please call the Department of Student Housing and Residential Life at (205) 934-2092, come by the office in Denman Hall G101 at 1604 9th Avenue South between 7:30 am and 4:30 pm, Monday through Friday, or e-mail us at tajacks@uab.edu.

An application to the Student Housing Office does not constitute a guarantee of an assignment. As housing at UAB is limited, it is recommended that potential residents apply as early as possible (especially those wanting housing for the Full Term). Any individual not assigned a room/apartment will be placed on a waiting list. It will be the student's responsibility to notify the Student Housing Office of any changes on the original application.

The University of Alabama at Birmingham administers it educational programs and activities, including admission, without regard to race, color, religion, sex, age, national origin, handicap, or Vietnam era or disabled veteran status. (Title IX of the Education Amendments of 1972 specifically prohibits discrimination on the basis of sex.) Direct inquiries to the UAB Affirmative Action Officer. The University of Alabama at Birmingham, Birmingham, Alabama 35294.

**Please Keep This Booklet for Future Reference**

# TYPICAL FLOOR PLANS



HIXSON HALL
Approx 352 SQ FT

EFFICIENCY
Approx. 312 SQ FT

BLAZER HALL &
UNIVERSITY HALL
ONE BEDROOM
Approx 425 SQ FT

CAMP HALL &
DENMAN HALL
ONE BEDROOM
Approx. 525 SQ FT

RAST HALL
Appro 990 SQ FT.

Garden Apartments



University Hall

Blazer Hall

Denman Hall

Garden Apartments

Hixson Hall

Camp Hall

Rast Hall

UAB CAMPUS MAP

PS-2855 REV 4/99

Pilgreen, Patsy

From:           Virginia D. Gauld [VDGAULD@sass.uab.edu]
Sent:           Wednesday, December 20, 2000 10:48 AM
To:             W. Ann Reynolds
Subject:        FW: Additional Information - .


Info on                Jenny

-----Original Message-----
From:  Warren F. Hale
Sent:  Tuesday, December 19, 2000 5:28 PM
To:    Virginia D. Gauld
Subject:    RE: Additional Information -

You may also wish to share with Dr. Reynolds the interventions and
meetings
that we have had with          While I cannot give you exact dates, the
timeframes for these discussions are as follows:


* Winter Term 1999 - Sue McKinnon and I met with Mr. and Mrs.
and
          to discuss her desire to enroll at UAB and reside on-campus. A
discussion concerning the transitional issues of a 15 year old to a
college
campus was the focus of the discussion. Further, we discussed the B'ham
curfew, health care, safety and security, student housing placement
(Rast
Hall), etc.


* Early August - Sgt. Forsyth, Rachel Smith and I met with          to
discuss guest and visitation privileges and rumors of sexual activity.
          stated that her hosting guests was okay with her parents. I
informed her that I would verify this. Further, she denied any sexual
activity, that these were just rumors. I did contact Mrs.          and
addressed my concerns regarding !          hosting guests. Mrs. ·  ·
stated that          had her permission to host any guest she wanted
(male
or female) because she trusted          judgment.


* Fall Term 2000 (September) - Rumors regarding ·          sexual
activity
continue, specifically with the football team members.
continues to
deny rumors. I spoke with Coach Larry Crowe regarding these rumors.
Specifically, I spoke about .          inability to consent to sexual
activity due to her age (16).


          through out the fall term continued to push the limits
regarding
B'ham curfew. On multiple occasions, UAB Police Officers warned

Exhibit B

about violating the curfew. She ignored these warnings.

Warren F. Hale, Director
Student Housing and Residential Life
University of Alabama at Birmingham
1604 9th Avenue South. DNMH 101
Birmingham, Alabama 35294-1230
(205) 934-2420

Pilgreen, Patsy

| | |
|---|---|
| From: | Virginia D. Gauld [VDGAULD@sass.uao.edu] |
| Sent: | Wednesday, December 20, 2000 10:46 AM |
| To: | W. Ann Reynolds |

I wanted to bring you up to date on-                        the student we met
with last year who was 15 years old who wanted to come to college.  You will
recall that we met with her and her parents and awarded her a scholarship.

                has not done well socially or academically.  She has a 1.96 gpa and
is on academic warning.  I am forwarding an email I received yesterday from
Warren Hale which summarizes the problems we have had with                    I
think her parents (who are much older, well meaning people but probably
manipulated by              now understand the severity of her behavior.

Just wanted you to be aware that some times we win and sometimes we lose!
Jenny



**Exhibit C**



# ™ UAB Police Department

# UAB Police



## THE LAW ENFORCEMENT

## CODE OF ETHICS

AS A LAW ENFORCEMENT OFFICER. MY DUTY IS TO SERVE THE COMMUNITY: TO SAFEGUARD LIVES AND PROPERTY; TO PROTECT THE INNOCENT AGAINST DECEPTION, THE WEAK AGAINST OPPRESSION AND INTIMIDATION. AND THE PEACEFUL AGAINST VIOLENCE OR DISORDER: AND TO RESPECT THE CONSTITUTIONAL RIGHTS OF ALL TO LIBERTY. EQUALITY. AND PURSUIT OF HAPPINESS.

I WILL KEEP MY PRIVATE LIFE UNSULLIED AS AN EXAMPLE TO ALL AND WILL BEHAVE IN A MANNER WHICH DOES NOT BRING DISCREDIT TO ME OR MY AGENCY. I WILL MAINTAIN COURAGEOUS CALM IN THE FACE OF DANGER. SCORN, OR RIDICULE; DEVELOP SELF RESTRAIN; AND BE CONSTANTLY MINDFUL OF THE WELFARE OF OTHERS. HONEST IN THOUGHT AND DEED IN BOTH MY PERSONAL AND OFFICIAL LIFE. I WILL BE EXEMPLARY IN OBEYING THE LAW AND THE REGULATIONS OF MY DEPARTMENT. WHATEVER I SEE OR HEAR OF A CONFIDENTIAL NATURE OR THAT IS CONFIDED TO ME IN MY OFFICIAL CAPACITY WILL BE KEPT EVER SECRET UNLESS REVELATION IS NECESSARY IN THE PERFORMANCE OF MY DUTY.

**Exhibit D**

I WILL NEVER ACT OFFICIOUSLY OR PERMIT PERSONAL FEELINGS, PREJUDICES, POLITICAL BELIEFS, ASPIRATIONS, ANIMOSITIES OR FRIENDSHIPS TO INFLUENCE MY DECISIONS. WITH NO COMPROMISE FOR CRIME AND WITH RELENTLESS PROSECUTION OF CRIMINALS, I WILL ENFORCE THE LAW COURTEOUSLY AND APPROPRIATELY WITHOUT FEAR OR FAVOR, MALICE OR ILL WILL, NEVER EMPLOYING UNNECESSARY FORCE AND NEVER ACCEPTING GRATUITIES.

I RECOGNIZE THE BADGE OF MY OFFICE AS A SYMBOL OF PUBLIC FAITH, AND I ACCEPT IT AS A PUBLIC TRUST TO BE HELD SO LONG AS I AM TRUE TO THE ETHICS OF THE POLICE SERVICE. I WILL NEVER ENGAGE IN ACTS OF BRIBERY NOR WILL I CONDONE SUCH ACTS BY OTHER POLICE OFFICERS. I WILL COOPERATE WITH ALL LEGALLY AUTHORIZED AGENCIES AND THEIR REPRESENTATIVES IN THE PURSUIT OF JUSTICE.

I KNOW THAT I ALONE AM RESPONSIBLE FOR MY OWN STANDARD OF PROFESSIONAL PERFORMANCE AND WILL TAKE EVERY OPPORTUNITY TO ENHANCE AND IMPROVE MY LEVEL OF KNOWLEDGE AND COMPETENCE.

I WILL CONSTANTLY STRIVE TO ACHIEVE THESE OBJECTIVES AND IDEALS, DEDICATING MYSELF BEFORE GOD TO MY CHOSEN PROFESSION...... LAW ENFORCEMENT.



Send your comments to **aburks@uab.edu**

This Webpage last updated on December 2, 1999

